UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DATTO INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:11-cv-617 (VLB) |
| KATHLEEN BRABAND, | : | |
| Defendant and | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AUSTIN MCCHORD and | : | |
| TIRA VANDERLINDEN, | : | |
| Third Party | : | |
| Defendants. | : | |
| | | February 29, 2012 |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT AND THIRD-PARTY PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS [DKT. #50] AND GRANTING IN PART AND DENYING IN PART THIRD PARTY DEFENDANTS' PARTIAL MOTION TO DISMISS [DKT. #34]**

**I.      Introduction**

This lawsuit arises out of a dispute between Plaintiff, Datto, Inc. ["Datto"] and Kathleen Braband ["Braband"], the former Vice President of Sales and Business Development for Datto.  Plaintiff, Datto Inc., filed this lawsuit as a declaratory judgment action seeking an affirmative declaration that an employment letter is not an enforceable contract. Additionally, Datto filed several other claims against Braband, including a violation of the Computer Fraud & Abuse Act, 18 U.S.C. §1030, a violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §35-50, et. seq., a computer related offense under Conn. Gen. Stat. §52-570b, and several Connecticut common law causes of action,

1

including breach of contract, breach of fiduciary duty, tortious interference with business relations, and trespass to chattels. Braband in turn has raised several counterclaims against Datto, as well as third party claims against Austin McChord ["McChord"], the founder and majority shareholder of Datto, and Tira Vanderlin ["Vanderlin"], the chief financial officer of Datto. Currently pending before the Court is a partial motion to dismiss [Dkt. #34] filed by Datto, McChord and Vanderlin pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and a motion for judgment on the pleadings [Dkt. #50] filed by Braband as to her First and Sixth Counterclaims, and dismissing Datto's First Claim.

## II.    Factual Background

The following facts are taken from the Datto's Complaint [Dkt. #1] and Braband's Answer setting forth several counterclaims [Dkt. #20].

Datto, founded in February 2007 by Austin McChord, is a company that provides designs for and markets computer hardware systems for use by businesses in the back-up and recovery of electronic data. [Dkt. #20, Answer with Counterclaims, ¶¶75-76]. On February 4, 2009, McChord contacted Braband via email to offer her an employment position with Datto. [*Id.* at ¶83]. At the time, Braband was enrolled in a training program at UBS. [*Id.* at ¶81]. After a series of communications, both written and telephonic, McChord and Braband negotiated the terms of her employment. [*Id.* at ¶85]. This understanding was memorialized in a letter dated April 1, 2009. [*Id.*].

The April 1, 2009 employment letter ["Employment Letter"], signed by both Braband and McChord, set forth the terms of the employment agreement,

providing that Braband would receive a 10% ownership interest in Datto on the date she was hired, subject to forfeiture if she left Datto prior to April 1, 2010. [Dkt. #1, Compl., ¶¶7-8]; [Dkt. #20, Answer, ¶¶86, 88]. Further, the Employment Letter provided that Braband would receive an additional 10% ownership interest in the Datto if she remained employed by Datto for an additional year and if the certain sales targets were achieved. [Dkt. #1, Compl., ¶9]; [Dkt. #20, Answer, ¶88].

Datto contends that  Braband's period of employment with Datto was tumultuous, marked by incidents of subordination and a refusal to perform her job requirements beginning as early as the first week of her employment. Datto asserts that Braband refused to attend trade shows, market new product lines, and speak with other members of the sales department. [Dkt. #1, Compl., ¶11]. As a result of this behavior, Datto reports that Braband was placed on probation in early November 2009. [*Id.*]. Datto asserts that Braband continued to act in an insubordinate manner and was suspended in September 2010 for failure to perform her responsibilities. [*Id.* at ¶12]. Datto further alleges that Braband acted in a consistently unprofessional manner, demonstrating an abrasive demeanor towards her colleagues prompting several employees to complain about her behavior. [*Id.* at ¶13].

As the Vice President of Sales, Datto reports that Braband was responsible for developing business and researching competitors, and was thus given access to client information and history maintained primarily through a customer relationship management database ["CRM database"], which Braband could access remotely. [Dkt. #1, Compl., ¶15]. Datto further alleges that on September

**3**

28, 2010, Braband signed an Employee Handbook provided by Datto outlining the company's performance and conduct expectations. [*Id.* at ¶14]. The Handbook, signed by Braband, included a Confidentiality and Non-Solicitation Agreement prohibiting the disclosure of confidential information or trade secrets or the use of such information other than for Datto's sole benefit, and an agreement not to solicit current or prospective customers for one year following separation of employment. [*Id.*].

On November 9, 2010, Braband was terminated from her employment at Datto. [Dkt. #1, Compl., ¶17]; [Dkt. #20, Answer, ¶113-14]. Following her termination, Datto alleges that Braband removed or retained files, data and information belonging to Datto from Datto computers and by accessing Datto's CRM database without authorization and deleted customer contact information and customer history within the database. [Dkt. #1, Compl., ¶18]. Datto further alleges that Braband improperly retained an Apple iPad tablet belonging to Datto and withheld sales information belonging to Datto. [*Id.* at ¶20]. Moreover, Datto asserts that Braband disclosed confidential information belonging to Datto, including the personal health information of Datto employees, and caused this information to be posted on an online forum. [*Id.* at ¶21].

Datto reports that Braband is currently employed as the Vice President of Channel Development for PathSolutions, Inc. [Dkt. #1, Compl., ¶22]. Datto asserts that Braband is using Datto's trade secrets and confidential information to market and sell products for her current employer, and that Braband, through her new

4

position of employment, has solicited Datto's current, former and prospective customers. [*Id.* ¶23].

Braband disputes Datto's characterization of the circumstances of her employment with Datto. Braband reports that she was hired as the third full-time employee of a Datto, a start-up venture, brought on board to apply her "business acumen to develop an effective marketing plan and generate sales and visibility in the market place." [Dkt. #20, Answer, ¶¶84, 89]. At the time she was hired, Braband asserts that Datto's business strategy of direct sales was flawed and ineffective, reporting that Datto's monthly sales totaled $25,000. [*Id.* at ¶¶90-91]. Braband alleges that she worked diligently to increase Datto's sales by creating and implement a channel-only sales model, involving sales through distributors. [*Id.* at ¶¶92-93]. Braband contends that as the result of her efforts, monthly sales increased to $130,000 and the company satisfied one of the sales targets set forth in the April 1, 2009 Employment Letter by obtaining $250,000 in revenue over a three month period. [Dkt. #20, Answer, ¶¶97-98].

Having satisfied the second sales target in her Employment Letter, Braband asserts that she spoke with McChord in July 2010 regarding the second 10% ownership interest in Datto which she asserted she was owed. [*Id.* at ¶103]. Braband asserts that McChord assured her that she had a 20% ownership interest in the company, promising to retain an attorney within thirty days to prepare the documentation necessary to formally reflect this interest. [*Id.* at ¶104]. Braband alleges that followed up on this conversation on September 3, 2010, by meeting with McChord to inquire as to his progress in retaining counsel to memorialize

her 20% ownership interest. [*Id.* at ¶105].  Braband asserts that during this conversation, McChord became irate and critized Braband for raising the issue. [*Id.* at ¶105].

In September 2010, McChord hired third party defendant Tira Vanderlin as Chief Financial Officer of Datto without informing Braband that he was looking to hire a CFO. [Dkt. #20, Compl., ¶107].  On October 6, 2010, Braband asserts that she again emailed McChord to inquire about her ownership interest indicating that in light of her satisfaction of the sales goals and the changes going on at Datto she was concerned by the delay. [*Id.* at ¶108]. Braband reports that McChord promised to make a concerted effort to formalize her interest within 30 to 60 days. [*Id.* at ¶109].

On November 8, 2010, Braband asserts that she received an email from McChord requesting that she attend a meeting on November 9, 2010 with Datto's lawyers. [*Id.* at ¶110].  At the meeting on November 9, 2010, attended by Vanderlinden, McChord, and an attorney for Datto, Braband was informed that her employment was terminated. [*Id.* at ¶¶113-114].  Braband asserts that Vanderlinden informed her that she was not entitled to any ownership interest in Datto and attempted to coerce her into signing a settlement agreement. [*Id.* at ¶114]. Insisting that she was entitled to a 20% ownership interest in Datto, Braband refused to sign the settlement agreement. [*Id.* at ¶¶116,119].

III.    Standard of Review

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949-50). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950). "The plausibility

standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949 (internal quotation marks omitted).

The aforementioned plausibility standard applicable to motions to dismiss applies to Rule 12(c) motions for judgment on the pleadings as well. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) ("In deciding a Rule 12(c) motion, we 'employ [ ] the same . . . standard applicable to dismissals pursuant to [Rule] 12(b)(6).") (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). The Court must accept all factual allegations in Datto's Complaint as true and draw all reasonable inferences in Plaintiff and Counterclaim Defendant Datto's favor. *See Johnson v. Rowley*, 569 F.3d at 43 (citing *ATSi Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

The Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). In addition, the Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Here, both Datto and Braband refer to and rely on the April 1, 2009 Employment Letter, attached to the Complaint as Exhibit A. [Dkt. #1, Compl, Ex. A]. Therefore, the Court takes judicial notice of the Employment Letter for the

**8**

purposes of its analysis of both the motion to dismiss and the motion for judgment on the pleadings. *See Anderson v. Derby Bd. of Educ.*, 718 F.Supp.2d 258, 273 n.33 (D.Conn. 2010).

## IV.  Discussion

### A.  Enforceability of the April 1, 2009 Employment Letter

Count One of Datto's Complaint seeks a declaratory judgment that the April 1, 2009 Employment letter, signed by both McChord and Braband is not a valid or enforceable contract for two reasons: (1) Datto asserts that the letter is facially vague and ambiguous, because the key term "ownership" is undefined; (2) Datto asserts that the letter is not supported by consideration because Braband failed to perform her employment responsibilities and violated the Datto Employee Handbook such that she effectively resigned from the company.  Datto raises a new argument as to unenforceability in its Memorandum in Opposition to Braband's Motion for Judgment on the Pleadings, arguing that key terms are missing from the contract, including salary and conditions of employment, such that the contract is not complete. However, Datto may not amend its complaint through a memorandum of law. *See Santiago v. Pressly*, 10-cv-4797 (PAE), 2011 WL 6758386, at *5 (S.D.N.Y. Dec. 23, 2011) (citation omitted); *see also Natale v. Town of Darien, Conn.*, no. 3:97cv583 (AHN), 1998 WL 91073, at *4 n.2 (D.Conn. Feb. 26, 1998).  Accordingly, this argument will not be considered for purposes of the enforceability analysis.

Braband's Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. Rule 12(c) seeks dismissal of Datto's claim for declaratory judgment, contending that the terms of the employment agreement are clear and definite, and that Datto received sufficient consideration for the agreement, and therefore the agreement is enforceable.

**1. Ambiguity**

Datto asserts that factual disputes plague the Employment Letter regarding the formation of the agreement and whether the parties reached a meeting of the minds on several key terms. Specifically, Datto argues that the parties currently have differing interpretations of the term "ownership" in the second paragraph of the employment letter, claiming that "Braband consistently maintains that the Letter should be interpreted as granting her shares in Datto, while Datto just as vociferously denies this interpretation." [Dkt. #62, Pl. Objection to Motion for Judgment on the Pleadings, p. 8].  Moreover, Datto argues that its denials of factual allegations in Braband's pleadings, including denying that the letter constitutes a valid and enforceable contract, denying that there was a meeting of the minds, and denying that Braband was entitled to a 20% ownership interest in Datto, indicate that factual disputes exist such that the entry of judgment as a matter of law in favor of Braband would not be appropriate.

The Supreme Court of Connecticut recently addressed the definition of an unambiguous contract, explaining the proper role of the court in analyzing a claim of ambiguity, stating that:

> " '[A] contract is unambiguous when its language is clear and conveys a definite and precise intent . . . The

> Court will not torture words to impart ambiguity where
> ordinary meaning leaves no room for ambiguity . . .
> Moreover, the mere fact that the parties advance
> different interpretations of the language in question
> does not necessitate a conclusion that the language is
> ambiguous . . . In contrast, a contract is ambiguous if
> the intent of the parties is not clear and certain from the
> language of the contract itself . . . [A]ny ambiguity in a
> contract must emanate from the language used by the
> parties . . . The contract must be viewed in its entirety,
> with each provision read in light of the other provisions .
> . . and every provision must be given effect if possible to
> do so . . . If the language of the contract is susceptible
> to more than one reasonable interpretation, the contract
> is ambiguous.' " *Harbor Pointe, LLC v. Harbour Landing
> Condominium Ass'n, Inc.*, 300 Conn. 254, 260-61 (Conn.
> 2011).

Accordingly, as the Connecticut Supreme Court has made clear, the Court must

look to the language in the contract itself to determine if an ambiguity exists.

Datto's assertions regarding the parties' conflicting interpretations of the term

"ownership" are not relevant. The Court's analysis is limited to the terms of the

Letter itself.

The Employment Letter provides that:

> "Upon date of hire you will receive 10% ownership of
> Datto Inc. Should you leave before April 1, 2010, your
> ownership will be reduced to 0% upon exit. You are
> eligible for an additional 10% ownership upon reaching
> the sales target of $250,000 trailing 3 months revenue
> (not calendar quarter). You will relinquish the 10%
> should you leave, on your own volition, within 12
> months of reaching the stated sales target. For the
> terms of this contract, future valuation will be based on
> 5x EBITDA." [Dkt. #20, Ex. 1, Employment Letter of April
> 1, 2009].

In analyzing this contract language to determine whether the parties' intent

regarding the term "ownership" is clear and certain on its face, or whether the

contract is susceptible to more than one reasonable interpretation, the language "must be accorded its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Tallmadge Bros., Inc. v. Iroquis Gas Transmission System, L.P.*, 252 Conn. 479, 498 (2000) (citation omitted).  Where, as here, the agreement itself does not define the term in question, "whether such term is ambiguous turns on whether it has varying definitions in common parlance." *Remillard v. Remillard*, 297 Conn. 345 (2010) (citing *Honolik v. Greenwich*, 293 Conn. 698, 710 (2009).

The plain language of the Employment Letter states that upon two conditions, specific percentages of ownership interest in the company will be awarded. Ownership in a corporation is manifested by equity, which is stock. The specification that "future valuation will be based on 5x EBITDA" is entirely consistent with this plain meaning, given that it is often difficult to assign value to the shares of privately held close corporations, as Datto acknowledges in its Memorandum in Opposition to Braband's Motion for Judgment on the Pleadings. [Dkt. #62, p. 17-18].  Defendant's attempts to add ambiguity to a term that is patently clear on its face do not comport with well-established principles of contract interpretation. *See Tallmadge Bros.*, 252 Conn. at 498 ("any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms."); *see also Final Cut, LLC v. Sharkey*, 2012 WL 310752 (Conn. Super. Jan. 3, 2012) ("Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement").

Moreover, there is a presumption, as recognized by the Connecticut Supreme Court, that "the language used is definitive" when "the contract at issue is between sophisticated parties and is commercial in nature." *William Ravies Real Estate, Inc.*, *v. Newtown Group Properties Ltd. Partnership*, 95 Conn. App. 772 (2006) (quoting *United Illuminating Co v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 670 (2002*)).

Contrary to Datto's assertion, "[a]lthough ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Tallmadge Bros.,* 252 Conn. at 495 (citing 3 A. Corbin, Contracts (1960) §554, pp. 223-25 ("[i]f the words of the agreement . . . are definite and there is no doubt as to the relevant surrounding circumstances, the interpretation of words is said to be a matter for the court")); *see also* 11 S. Williston, Contracts (4th Ed. 1999) §30:6, pp. 77-83 ("[t]he interpretation and the construction of a written contract present only questions of law, within the province of the court, so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face").

As previously discussed, the term "ownership" in the Employment Letter has a definite and clear meaning and is not ambiguous. Therefore, the parties' intent may be determined by the Court as a matter of law, by identifying the plain meaning of the language of the contract. *Tallmadge Brothers*, 252 Conn. at 498. The Court holds that the term "ownership" in the Employment Letter

unambiguously provides that, upon the occurrence of two conditions, Datto shall transfer or assign to Braband the specified percentage of ownership interest in the form of stock in the company.

### 2. Consideration

Datto seeks to challenge the enforceability of the Employment Letter on grounds of lack of consideration as well, asserting that the grave and consistent deficiencies in Braband's job performance amounted to a constructive resignation, thereby denying Datto of any consideration under the employment agreement.

Braband challenges this argument on both legal and factual grounds. Braband asserts that Datto's attempt to challenge the adequacy of consideration on the basis of the quality of performance tendered is not a legally cognizable basis to attack the enforceability of the contract. Further, Braband contends that several undisputed facts demonstrate that she expended substantial efforts as Vice President of Sales for Datto, and therefore incidents of insubordination are insufficient to set aside the Employment Agreement. Specifically, Braband argues that Datto has conceded that Braband was employed as a sales executive for over nineteen months, during which time she performed various job requirements, including attending numerous trade shows and accepted a variety of awards on behalf of the Company. [Dkt. #48, Datto's Answer to Braband's Counterclaims, ¶99]. Moreover, Braband asserts that Datto has admitted that during Braband's tenure, during which time she was the VP of Sales and

Business Development, the Company's sales and revenues increased dramatically. [*Id.* at ¶¶91, 97].

"Consideration consists of 'a benefit to the party promising, or a loss or detriment to the party to whom the promise is made.'" *Christian v. Gouldin*, 72 Conn. App. 14, 23 (2002) (quoting *Finlay v. Swirsky*, 103 Conn. 624, 631 (1925)). An exchange of promises will satisfy the consideration requirement, unless one of the promises made is a promise to do that which one is already bound to do. *Gouldin*, 72 Conn. App. at 23 (citations omitted).

It has long been understood that "[t]he doctrine of consideration does not require or imply an equal exchange between the contracting parties . . . The general rule is that, in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." *Osborne v. Locke Steel Chain Co.*, 153, Conn. 527, 532-33 (1966) (internal citations omitted).

However, where the concern is with the quality of performance of the consideration, it is a general principle of contract law, as has been recognized by the Supreme Court, that "[w]hen consideration for a contract fails—that is, when one of the exchanged promises is not kept—we do not say that the voluntary bilateral consent to the contract never existed, so that it is automatically and utterly void; we say that the contract was broken." *Puckett v. U.S.*, 556 U.S. 129, 137 (2009) (citing 23 R. Lord, Williston on Contracts §63.1 (4th ed. 2002)). Therefore, Datto's attempt to assert that deficiencies in Braband's performance

have deprived them of consideration and rendered the contract invalid and unenforceable are unfounded. Although allegations as to the deficiency of performance may be used to substantiate a claim for breach of contract, such allegations are insufficient to challenge the formation of a contract.

Based on the aforementioned reasoning, the Employment Letter of April 1, 2009 is a valid and enforceable employment contract. Accordingly, Plaintiff Datto's request for declaratory judgment declaring the Employment Letter to be invalid and unenforceable, and alternatively to provide that Plaintiff is entitled to a money judgment rather than shares in Datto is DENIED.

Having addressed the enforceability of the Employment Agreement, the Court will now address Braband's Motion for Judgment on the Pleadings and Datto's Motion to Dismiss several of Braband's Counterclaims.

### B.  Braband's Motion for Judgment on the Pleadings

In Count One of Braband's counterclaims against Datto, Braband alleges that Datto has breached the Employment Letter by failing to provide her with a 20% ownership interest in Datto. Braband alleges that she has upheld both conditions necessary to receive such an ownership interest, asserting that she did not terminate her employment relationship prior to April 1, 2010, and that she achieved the monthly sales target necessary to earn the second 10% interest.

In Count Six of Braband's counterclaims, Braband asserts that the ownership interest provided for in the Employment Letter was offered in lieu of a higher salary as part of her overall compensation package, and therefore, the interest constitutes "wages" under Conn. Gen. Stat. §31-72(3). Braband asserts

that failure to provide her with the 20% interest under the Employment Letter constitutes failure to pay wages in violation of Connecticut's Wage Statute. Further, Braband asserts that this failure to pay was willful, and therefore seeks double damages under the Conn. Gen. Stat. §31-72, along with attorney's fees and costs.

Braband asks the Court to enter a judgment on the pleadings with respect to both Count One and Count Six against Datto, arguing that the pleadings establish that the conditions prescribed by the agreement for the issuance of the 20% interest in the Company were attained, and that the award of interest in the company constitutes "wages" within the meaning of Connecticut's Wage Protection Statute, Conn. Gen. Stat. §31-72(a)(3).

Datto objects to both requests for judgment on the pleadings. Datto asserts that the language relating to the second 10% interest in the Company, "[y]ou are eligible for an additional 10% ownership interest upon reaching the sales target of $250,000 trailing 3 month revenue (not calendar quarter) indicates that Braband would be eligible for, but not necessarily entitled to, such interest, provided the requisite condition is satisfied. Further, Datto argues that Braband is not entitled to the initial 10% ownership interest, asserting that Braband constructively resigned from the company prior to the prescribed one year tenure.  Datto objects to Braband's Wage Act claim asserting that the interest in the Company does not constitute "wages" under the Act.

    1.  **Braband's First Counterclaim: Breach of Contract**

Under Connecticut law, in order to establish a breach of contract, a plaintiff must show "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Bross v. Hillside Acres, Inc.*, 92 Conn. App. 773, 780-81, 887 A.2d 420 (Conn. App. 2006).

Regarding the first 10% ownership interest in Datto, the Employment Letter provides that "[u]pon date of hire, you will receive 10% ownership of Datto, Inc. Should you leave before November of 2010, your ownership will be reduced to 0% upon exit." This language unambiguously provides that Braband was entitled to, upon her first date of employment with Datto, a 10% ownership interest in Datto, subject to forfeiture if she left the Company before April 1, 2010.

Despite the fact that Datto asserts that it placed Braband on probation in November of 2009 and did not terminate her until November of 2010, Datto attempts to rely on the doctrine of constructive resignation prior to April 2010 to defeat Braband's breach of contract claim. This assertion of constructive resignation lacks merit. Datto fails to provide any precedent under Connecticut law or within the Second Circuit recognizing a claim of constructive resignation in a factually analogous context, nor has the Court found any such existing precedent. In *Bean v. Wisconsin Bell, Inc.*, 366 F.3d 451 (7th Cir. 2004), relied upon by Datto, the Seventh Circuit considered whether the plaintiff's behavior amounted to constructive resignation, noting that the doctrine represented an extreme scenario, "a forcing by the employee of termination by engaging in conduct inconsistent with her continuing in the job." 366 F.3d at 455. The context of the case, a Title VII claim for discriminatory discharge requiring the plaintiff to

demonstrate an adverse employment action, however, is inapposite to the instant case. As the Seventh Circuit more recently explained, constructive resignation occurs "where, to obtain a benefit conditional on being discharged, such as severance pay, an employee engages in conduct intended to force her employer to fire her." *Joy v. Hay Group, Inc.*, 403 F.3d 857 (7th Cir. 2005). Although Datto fails to identify a single Connecticut case on point, the only Connecticut case discussing constructive resignation offers no support to Datto's assertion. *See Gurliacci v. Mayer*, 218 Conn. 531, 590 A.2d 914 (Conn. 1991) (addressing constructive resignation with regards to an employee, who, by virtue of voluntary intoxication, is unable to fulfill his employment obligations).

Datto's factual allegations and admissions to Braband's Counterclaims prevent any plausible claim of constructive resignation, even if such a doctrine were cognizable under Connecticut law. Datto reports that On April 1, 2009 Braband was hired as Vice President of Sales and Business Development for Datto. [Dkt. #1, Compl., ¶6]. Datto admits that Braband attended trade shows and industry events on behalf of Datto throughout 2009 and 2010, including as late as November 2010. [Dkt. #48, Datto's Answer to Counterclaims, ¶¶94, 99, 101, 110]. Moreover, Datto admits that Braband's performance was award-winning. [*Id.* at ¶¶95, 99]. Lastly, Datto admits that on November 9, 2010, it terminated Braband's employment with the Company. [Dkt. #1, Compl., ¶17]; [Dkt. #48, Answer to Counterclaims, ¶112]. Although Datto reports that Braband was placed on probation in November 2009 after incidents of insubordination and refusal to perform her job requirements and subsequently suspended in September 2010,

Datto's facts and admissions preclude any plausible claim of constructive resignation. By virtue of its admission that Braband attended an industry event on behalf of Datto in November 2010 and was terminated on November 9, 2010, Datto has conceded that Braband did not "leave before April 2, 2010." Moreover, none of Datto's factual allegations assert that Braband was unable to fulfill her employment obligations, or that she engaged in conduct intended to force her employer to fire her in an attempt to obtain a benefit conditional on being discharged. There is absolutely no provision in the contract indicating that Braband stood to receive a benefit upon termination. On the contrary, the Employment Letter requires Braband to forfeit certain benefits upon her exit from Datto within a year of fulfilling the conditions to receive such benefits.

Even construing the facts in the light most favorable to Datto, the plain language of the Employment Letter provides that Braband was entitled to a 10% ownership interest in Datto as of the very first date of her employment at the Company, and it is readily apparent that Braband remained employed at Datto through November 9, 2010 and sought to *remain* employed to obtain a conditional benefit, rather than to be terminated to obtain a benefit. Accordingly, where Braband fulfilled the condition precedent to the receipt of the initial 10% ownership interest in Datto and Datto failed to provide her with the 10% interest in the Company, Datto has breached the Employment Letter. Therefore, Braband's motion for Judgment on the Pleadings as to Count One, her breach of contract claim related to the first 10% ownership interest to be granted "upon date of hire," is GRANTED.

Regarding the second 10% ownership interest in Datto, the Employment Letter provides that:

> "You are eligible for an additional 10% ownership upon reaching the sales target of $250,000 trailing 3 month revenue (not calendar quarter). You will relinquish the 10% should you leave, on your own volition, within 12 months of reaching the stated sales target. For the terms of this contract, future valuation will be based on 5x EBITDA." [DKt. #20, Ex. 1, Employment Letter of April 1, 2009].

As previously discussed, "[i]f the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.' "*Harbor Pointe,* 300 Conn. at 260-61. The Court finds that this provision is ambiguous because the phrase "upon reaching" does not indicate whether the condition requires Datto, as a company, to reach the sales target, or Braband in particular.  In the absence of definitive contract language, the determination of the Parties' intent regarding this provision of the contract is a question of fact. *See Tallmadge,* 252 Conn. at 495. In addition, this provision indicates that Braband would be eligible to receive an additional ownership interest rather than that she is entitled to receive it. Eligible is an equivocal, while entitled is an unequivocal term. Merriam Webster defines eligible as "qualified to participate or be chosen," whereas entitled is defined as "furnish[ed] with proper grounds for seeking or claiming something." Merriam Webster Online Dictionary, http://www.merriamwebster.com/dictionary/eligible (last visited February 28, 2012); Merriam Webster Online Dictionary, http://www.merriamwebster.com/dictionary/entitled (last visited February 28, 2012).  Thus while she may or may not have been eligible to receive such an interest it is unclear whether she was entitled to receive it.

Construing Datto, the non-moving party's factual allegations as true and drawing all reasonable inferences in Datto's favor, the Court finds that while Braband has plausibly alleged a breach of contract as to this second 10% ownership interest, where reasonable minds could differ as to the interpretation of this provision, judgment on the pleadings is not appropriate. Rather, the Parties should be allowed to develop the factual record as to their intent regarding this provision of the contract. Accordingly, Braband's motion for judgment on the pleadings as to Count One of her Counterclaims with regards to the second 10% ownership interest in Datto is DENIED.

### 2. Braband's Sixth Counterclaim: Violation of Connecticut Wage Protection Statutes

Connecticut's Wage Statute defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." Conn. Gen. Stat. §31-71a(3).  Conn. Gen. Stat. §31-71e prohibits an employer from withholding or diverting any portion of an employee's wages unless:

> "(1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book, or (4) the deductions are for contributions attributable to automatic enrollment…"

Further, Conn. Gen. Stat. §31-72 "provides for 'a discretionary award of double damages with costs and reasonable attorney's fees, to employees who are successful in actions against their employers for wages due.' " *Ravetto v.*

*Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 724 (2008); Conn Gen Stat. §31-72.  A trial court's discretion to award double damages, costs and reasonable attorney's fees is not unlimited. As the Connecticut Supreme Court has held, "it is appropriate for a plaintiff to recover attorney's fees and double damages under [§31-72] only when the trial court has found that the defendant acted with bad faith, arbitrariness or unreasonableness." (internal quotation marks omitted) *Ravetto*, 285 Conn. at 724. (citing *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210 (2003)).

A series of decisions by the Connecticut Supreme Court has added great clarity to the question of whether specific forms of compensation fall within the definition of "wages" under §31-72(a)(3) and are thereby subject to the protection of the Connecticut Wage Statutes.

Beginning first in *Weems v. Citigroup, Inc.*, 189 Conn. 769 (2008), the Court began by emphasizing that the Connecticut wage collection statutes are " 'remedial in nature,' namely, intended 'to prevent the employer from taking advantage of the legal agreement that exists between the employer and the employee,' and should be construed liberally in the employees' favor." 289 Conn. at 794 (citations omitted). Relying on New York case law construing a similar wage statute, the *Weems* court held that "bonuses that are awarded solely on a discretionary basis, and are not linked solely to the ascertainable efforts of the particular employee, are not wages under §31-72a(3)." *Id.* at 782.  Accordingly, the *Weems* court held that the bonuses at issue did not constitute "wages" under §31-72a(3) because the payments were purely discretionary and were tied to

23

"subjective factors such as diversity within a branch, and the profitability of particular branches, which are factors not entirely predictable or within the control of the specific employee." *Id.*

Next, in *Ziotas v. Reardon Law Firm, P.C.*, 296 Conn. 579 (2010) the Connecticut Supreme Court addressed a slightly different question, presented by a lawyer suing his former law firm alleging that the firm had violated the wage statutes by failing to pay him his annual bonus. Unlike *Weeks*, the bonus payment at issue was contractually required and only discretionary to the extent that the amount of the bonus was unspecified. *Id.* Relying heavily on the analysis in *Weeks*, the *Ziotas* court held that the annual bonus did not constitute "wages" under §31-72a(3) because although the bonus payment was contractually required, the amount of the bonus was discretionary and dependent on factors other than the employee's performance. *Ziotas*, 296 Conn. at 589.

Lastly, in the Connecticut Supreme Court's recent decision in *Associate Resources, Inc. v. Wall*, 298 Conn. 145 (2010), the Court held that that bonus payments under an employment agreement constituted "wages" under §31-72a(3) because the payments the employer was contractually bound to provide the bonuses, and the amount of bonus was not discretionary, as it was derived from the net profitability of a specific division of the defendant corporation and subject to a calculation by a contractually mandated formula. 298 Conn. at 176.

Therefore, as this series of decisions demonstrates, the classification of a compensation provision as wages under §31-72a(3) requires the satisfaction of 3 factors: (1) the award of compensation must be non-discretionary, (2) the amount

24

of the compensation must be non-discretionary, and (3) the amount of the bonus must be dependent on the employee's performance. 298 Conn. at 173-177.

Turning to the compensation provisions at issue in the present case, the Court finds that provision regarding the first 10% ownership interest in Datto to be provided "upon date of hire," falls squarely within the factual scenario addressed in *Associate Resources*. As previously discussed, this provision unambiguously provides that as of Braband's first date of employment at Datto, Datto was contractually bound to provide her with a 10% ownership interest in the company in the form of shares. Neither the decision of whether to provide the prescribed compensation, nor the amount of such compensation was subject to Datto's discretion. *See Garner v. W.R. Berkely Corp.*, 2010 WL 3447880, at *3-4 (Conn. Super. Aug. 9, 2010)(holding that stock options constituted wages under the Connecticut wage statutes where right to the stock options vested upon beginning work for the defendant corporation and the amount was not discretionary where the only fluctuation was the value of the fixed percentage of outstanding common stock).   Accordingly, Datto's failure to award Braband this 10% ownership interest constitutes, as a matter of law, a violation of Conn. Gen. Stat. §31-71e.

Therefore, the Court grants Braband's Motion for Judgment on the Pleadings as to Count Six of her Counterclaims against Datto and her First Claim against Third-Party Defendant McChord. However, to the extent that Braband's Motion for Judgment on the Pleadings seeks an award of double damages, fees and costs pursuant to §31-72, Braband's, this motion is DENIED.  Such an award

requires a factual finding that the defendant acted with bad faith, arbitrariness, or unreasonableness. *See Ravetto*, 285 Conn. at 724.

Regarding the second 10% ownership interest, in light of the previously discussed ambiguity surrounding the language "upon reaching" the prescribed sales target, as well as the term "eligible," the Court finds that Braband has failed to establish as a matter of law that the award of this compensation was non-discretionary and that the amount of the compensation was dependent on Braband's performance. Accordingly, where Braband has failed to establish as a matter of law that the second 10% ownership interest constitutes "wages" under §31-72a(3), Braband's Motion for Judgment on the Pleadings on Counterclaim Six against Datto and her First Claim against McChord pursuant to the Connecticut Wage Statutes is DENIED as to the second 10% ownership interest described in the Employment Letter.

### C. Braband's Wrongful Termination Claim

Braband brings a counterclaim of wrongful termination against Datto, alleging that Datto wrongfully discharged her in order to avoid providing her with compensation in which she had a vested interest under the Employment Letter. Braband asserts that this termination violated Connecticut's public policy, set forth in Connecticut's wage collection statute, prohibiting an employee from withholding or diverting any portion of an employee's accrued wages or compensation.

Datto asserts that the Court must dismiss Braband's wrongful termination claim because Connecticut courts have restricted the common law remedy of

wrongful termination to situations in which the conduct contravened public policy, and no alternative statutory remedy exists to address the particular public policy violation. Pointing to Braband's assertion that her interest in the compensation had already vested prior to her termination, Datto asserts that the Connecticut wage protection statutes provide her with an adequate remedy for the harm she has allegedly suffered.

Although generally under Connecticut law "contracts of permanent employment, or for an indefinite term, are terminable at will," a common law cause of action in tort for the discharge of an at will employee exists in limited circumstances. Such remedy is available subject to two particular limitations: (1) the former employee must establish "a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy," *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475 (1980); and (2) the employee must establish that he or she was "otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 648 (1985).

As another Court in this district has recognized, Conn. Gen. Stat. §31-72 provides a statutory recovery scheme for employees deprived of timely payment of compensation due. *Felekey v. American Telephone and Telegraph Co.*, No. 3:02-cv-691(CFD), 2004 WL 2958468, at *4 (D.Conn. Nov. 3, 2004) (dismissing plaintiff's claim for wrongful termination holding that the statutory remedy of §31-72 precludes a common law wrongful discharge claim).

However, as previously discussed, to receive the recourse provided by the statutory remedy provided under the Connecticut's wage protection statutes, the compensation at issue must constitute "wages" as defined in §31-72a(3). Compensation that does not fall within the definition of "wages" as set forth in §31-72a(3) is not protected by the alternative statutory remedy relied upon by Datto and therefore can properly be the subject of a common law cause of action for wrongful termination. *See, e.g., Okon v. Medical Marketing Group, Inc.*, No. CV93306032S, 1994 WL 463659 (Conn. Super. Aug. 18, 1994) (holding that plaintiff alleged a cognizable claim of wrongful termination where plaintiff alleged that his employment was terminated in order to prevent the vesting of certain rights to compensation, which, if vested, would be enforceable rights under Connecticut's wage protection statutes); *see also Atkins*, 5 Conn.App. at *648 (holding that plaintiff's claim of wrongful termination was precluded where "the public policy of age discrimination was adequately enforceable through statutory remedies and did not warrant judicial recognition of an independent cause of action.")

Accordingly, to the extent that the Court has granted Braband's claim for a violation of Conn. Gen. Stat. §31-71e, Braband has been provided with a statutory remedy to seek redress for her allegedly deprived compensation. However, given the factual uncertainties surrounding the second 10% ownership interest allegedly owing to Braband under the Employment Letter, it is unclear whether this compensation is protected by the statutory remedy of Connecticut's wage protection statutes. Therefore, it would be inappropriate, at this early juncture of the pleadings, to preclude Braband's wrongful termination claim where it is not

clear, as a matter of law, that the compensation at issue is subject to a statutory remedy. Therefore, Datto's motion to dismiss Braband's wrongful termination claim is DENIED.

### D.  Breach of Covenant of Good Faith

Setting forth nearly identical factual allegations, Braband alleges that Datto breached its obligation of good faith and fair dealing by unfairly prevent her from obtaining the compensation which she was owed, by failing to comply with its own representations, and by terminating her without good cause. Datto seeks to dismiss this claim, asserting that, as with wrongful termination, this common law cause of action is precluded by the existence of a statutory remedy to provide redress to Braband's purported harm, here, the Connecticut wage protection statutes.

Emphasizing the goal of "the fulfillment of the reasonable expectations of the parties," the Connecticut Supreme Court has restricted the applicability of the good faith and fair dealing principle to the context of at will employment arrangements. *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 572 (1984). Accordingly, the right to discharge at will will not be subjected to judicial scrutiny unless "the discharge involves 'impropriety . . . derived from some important violation of public policy.' " *Id.* (quoting *Sheets*, 179 Conn. at 475); *see also Paul v. Bank of America*, 2011 WL 5580789, at *3 (D.Conn. Nov. 16, 2011) ("Connecticut has recognized a cause of action for discharged at-will employees for breach of implied covenant of good faith and fair dealing only when the discharge is for a reason that violates public policy.") (citation omitted).  The determination of

whether the conduct in question violated an important public policy mirrors the analysis applied to the determination of whether a common law cause of action for wrongful discharge is available, requiring the court to discern whether the conduct was "demonstrably improper," and violated an explicit statutory or constitutional provision. *See Morris v. Hartford Courant Co.*, 200 Conn. 676 (1986) (quoting *Sheets*, 179 Conn. at 475).

Accordingly, for the reasons articulated above, to the extent that it is unclear whether or not the second 20% ownership interest allegedly owing to Braband is protected under Connecticut's wage protected statutes, it would be premature to preclude Braband from pursuing a claim of the breach of the covenant of good faith as a matter of law. Therefore, Datto's motion to dismiss as to Count Two of Braband's counterclaims is DENIED.

### E.  Promissory Estoppel and Unjust Enrichment

Braband alleges that Datto promised, in accordance with the conditions of the Employment Agreement, to provide her with certain compensation. Braband further alleges that she justifiably and foreseeably relied on this promise by accepting and continuing her employment with Datto and foregoing other employment opportunities. As a result of this reliance, Braband alleges that she has suffered damages.

Datto seeks to dismiss this claim, asserting that under Connecticut law, where an express contract claim exists, allegations of promissory estoppel cannot be maintained.

30

Braband challenges this assertion, arguing that in this diversity case, federal procedural law applies, and therefore, Fed. R. Civ. Pr. 8(d)'s acceptance of alternative pleading permits Braband to allege claims of both breach of contract and promissory estoppel.

Although Braband is certainly entitled under Fed. R. Civ. P. 8(d) to set forth alternative pleadings, where, as here, the Court has held, as a matter of law, that an express contract exists between the parties, Braband cannot overlook the existence of an express contract to assert a theory of promissory estoppel. *See Wood v. Sempra Energy Trading Corp.*, No. 03-CV-986(JCH), 2005 WL 465423, at *11 (D.Conn. Feb. 22, 2005) (holding that where both parties agreed that an express contract existed, plaintiff could not pursue a claim of promissory estoppel). Rather, Connecticut courts allow a plaintiff to pursue a claim of promissory estoppel only after it has been established that no express contract existed. *See Suffield Dev. Assoc. v. Society of Savings*, 243 Conn. 832 (1998) (concluding that plaintiff produced insufficient evidence to support the jury's verdict on a breach of contract claim and remanding for a new trial as to plaintiff's claim of promissory estoppel).

Similarly, under Connecticut law, " 'proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment.' " *Lieberman v. Emigrant Mortg. Co.*, 436 F.Supp.2d 357, 366 (D.Conn. 2006 (quoting *Polvcerari v. Peatt*, 29 Conn. App. 191, 199 (1992)).

Accordingly Datto's motion to dismiss is GRANTED as to Braband's fourth counterclaim against Datto for promissory estoppel and Braband's tenth claim

against McChord for unjust enrichment as the Court has denied Datto's challenge to the validity of the contract.

### F.  An Accounting

Braband's fifth counterclaim against Datto seeks an accounting of Datto's sales, revenue and value to protect her interests as a minority shareholder. Datto asserts that Braband is precluded from pursuing this equitable remedy in light of the statutory remedy provided by Conn. Gen. Stat. §33-946 which affords shareholders the right to inspect corporate records.

The Connecticut Supreme Court has defined the equitable remedy of an accounting as "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Mankert v. Elmatco Products, Inc.*, 84 Conn.App. 456, 460 (2004) (quoting 1 Am.Jur.2d 609, Accounts and Accounting §52 (1994).   In discussing the availability and scope of the equitable remedy of an accounting, the Connecticut Supreme Court relied upon the summary of the remedy set forth in American Jurisprudence, Second Edition, Accounts and Accounting, noting that " '[a]n accounting is not available in an action where the amount due is readily ascertainable. Equity will ordinarily take jurisdiction to settle the account if the facts create a reasonable doubt whether adequate relief may be obtained at law.' " *See id.* (quoting 1. Am.Jur.2d 609, Accounts and Accounting § 54 (1994)).

As American Jurisprudence, Accounts and Accounting §54 has recognized, the crux of the equitable remedy of an accounting is "the inadequacy

of the legal remedy," which forms the basis for equity jurisdiction. 1 Am.Jur.2d 609, Accounts and Accounting §54 (1994).

Here, as the Defendants have noted, Braband has a statutory remedy available which will afford her access to Datto's corporate records. As previously discussed, Braband is entitled to a 10% ownership interest in Datto in the form of stock in the Company. In fact, the Employment Letter unambiguously states that Braband was entitled to such an interest as of the date her employment with the Company began. Accordingly, Braband is a minority shareholder in Datto, entitled to rely on the Connecticut statute allowing for the inspection of corporate records by shareholders. The availability of this statutory remedy precludes Braband from relying on the equitable remedy of an accounting. *See Mankert*, 84 Conn.App. at 460 (" 'Equity will ordinarily take jurisdiction to settle the account if the facts create reasonable doubt whether adequate relief may be obtained at law.' ") (citation omitted); *see also* 1 Am.Jur.2d 610-11, Accounts and Accounting §54 ("The inadequacy of the legal remedy forms the basis for equity jurisdiction, and a suit in equity for an accounting.").

Conn. Gen. Stat. §33-946(a) provides that "[a] shareholder of a corporation is entitled to inspect and copy, during regular business hours at the corporation's principal office, any of the records of the corporation described in subsection (e) of section 33-945 if he gives the corporation a signed written notice of his demand at least five business days before the date on which he wishes to inspect and copy." The records listed in Conn. Gen. Stat. §33-945(e) to which a shareholder can gain access pursuant to §33-946(a) include the following:

> (e) A corporation shall keep a copy of the following records at its principal office: (1) Its certificate of incorporation or restated certificate of incorporation, all amendments to them currently in effect and any notices to shareholders referred to in subsection (*l*) of section 33-608 regarding facts on which a document is dependent; (2) its bylaws or restated bylaws and all amendments to them currently in effect; (3) resolutions adopted by its board of directors creating one or more classes or series of shares and fixing their relative rights, preferences and limitations, if shares issued pursuant to those resolutions are outstanding; (4) the minutes of all shareholders' meetings and records of all action taken by shareholders without a meeting for the past three years; (5) all written communications to shareholders generally within the past three years, including the financial statements furnished for the past three years under section 33-951; (6) a list of the names and business addresses of its current directors and officers; and (7) its most recent annual report delivered to the Secretary of the State under section 33-953.

Further, to the extent that Braband seeks access to Datto's corporate records relating to sales, revenue and value, Braband can rely on Conn. Gen. Stat. §33-946(c) which provides, in relevant part, that a shareholder may inspect and copy, upon five days written notice, the accounting records of the corporation. The Court notes however, that in order to access Datto's accounting records pursuant to §33-946(c), Braband must also comply with §33-946(d) which requires that:

> A shareholder may inspect and copy the records described in subsection (c) of this section only if: (1) His demand is made in good faith and for a proper purpose; (2) he describes with reasonable particularity his purpose and the records he desires to inspect; and (3) the records are directly connected with his purpose. Conn. Gen. Stat. §33-946(d).

Moreover, not only is Braband's request for an accounting precluded by the availability of a statutory remedy, the equitable remedy of an accounting is either is inapplicable to the present case, or redundant in light of the other forms of relief sought. Braband's counterclaim for an accounting asserts that:

> McChord has prevented Ms. Braband from having access to Datto's books and records. Mrs. Braband is entitled to an accounting from Datto with regard to the Company's sales, revenue, and value, and such an accounting is necessary to protect Mrs. Braband's interests as a minority shareholder. [Dkt. #20, Counterclaims, ¶¶148-49].

To the extent that Braband merely seeks access to Datto's account records as a minority shareholder seeking to protect the value of her interest in the Company, the statutory remedy for the inspection of corporate records set forth in Conn. Gen. Stat. §33-946 affords Braband precisely the relief she is seeking. In fact, this expressed goal is inconsistent with the equitable remedy of an accounting, which, as defined by the Connecticut Supreme Court, is an "an adjustment of the accounts of the parties and a *rendering of a judgment for the balance ascertained to be due.*" *Mankert*, 84 Conn.App. at 460 (emphasis added) (citation omitted).

However, Braband's assertion in her Opposition to Defendants' Motion to Dismiss that she "repeatedly requested that McChord provide her with documentation of her Datto shares," a request that she alleges that McChord repeatedly denied, suggests that Braband's true goal in seeking access to Datto's corporate records is to ascertain her status as a shareholder in the company as yet another attempt to obtain a judgment ordering Datto to provide her with the ownership interest which she alleges she is owed. To the extent that this is

Braband's goal, this claim is redundant. Braband has alleged claims of breach of contract and a violation of Connecticut's wage protection statutes, a successful prosecution of each of which would provide her with the relief she seeks.

Accordingly, Defendants' motion to dismiss Braband's fifth counterclaim for an accounting is GRANTED.

### G.  Braband's Claim against McChord for Violation of Connecticut's Wage Protection Statutes

In addition to her claim against Datto for violation of Connecticut's wage protection statutes, Braband has also raised a claim of violation of Conn. Gen. Stat. §31-71(e) against Third Party Defendant McChord. Defendants seek to dismiss this claim asserting that the Connecticut wage protection statutes do not extend liability to corporate officers in addition to the corporation.

Although previously courts in Connecticut diverged on the question of whether an individual could be considered an "employer" under Connecticut's wage protection statutes,  in *Butler v. Hartford Institute, Inc.*, 243 Conn. 454 (1997), the Connecticut Supreme Court resolved the question after conducting a comprehensive review of theissue, examining the statutory language, legislative intent, and applicable case precedent, holding that "an individual personally can be liable as an employer pursuant to §31-72, notwithstanding the fact that a corporation is also an employer of the claimant , if the individual is the ultimate responsible authority to set the hours of employment and to pay wages and is the specific cause of the wage violation." *Butler*, 243 Conn. at 464.

As Braband notes in her Memorandum in Opposition to Defendants' Motion to Dismiss, the sole case Defendants rely on to support their assertion that

corporate officers may not be held individually liable under Connecticut's wage protection statutes, *Stockmar v. Warrec Co.*, 844 F.Supp. 103 (D.Conn. 1994) pre-dated the Connecticut Supreme Court's decision in *Butler* and thus does not reflect the state of the applicable case law. *See Morales v. Cancun Charlie's Restaurant*, 2010 WL 7865081, at *6 (D.Conn. Nov. 23, 2010) (recognizing that "[t]he term 'employer,' as used in Conn. Gen. Stat. §31-72, 'encompasses an individual who possesses the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so.' ") (quoting *Butler*, 243 Conn. at 462).

In *Butler*, the Connecticut Supreme Court affirmed the trial court's imposition of liability on plaintiff's individual employer under Connecticut's wage protection statutes after carefully reviewing the factual record at trial and confirming that the evidence admitted supported the trial court's finding that the defendant, an individual employer, was the ultimate responsible authority over the plaintiff's employment and wages and was the specific cause of the wage violation at issue. 243 Conn. at 464-66. The evidence presented at trial established that the defendant-employer was the president and treasurer of the company, controlled the work which plaintiff performed including overtime hours required, reviewed all employee time cards before authorizing the payment of wages, and was specifically the cause of the withholding and refusal to pay the plaintiff's wages which were the subject of the lawsuit. *Id.*

Braband's factual allegations regarding McChord assert that he maintained a similar position at Datto, exerting complete control over the Braband's employment responsibilities and compensation. Braband has alleged that McChord founded Datto in February of 2007 and personally contacted her in February 2009 to offer her an employment position at Datto, his solely owned start-up company. [Dkt. #20, Braband's Counterclaims, ¶¶75, 83]. Braband asserts that McChord's offer of employment requested the assistance of Braband's "business acumen to develop an effective marketing plan and generate sales and visibility in the marketplace." [*Id.* at ¶84]. Braband alleges that she negotiated the terms of her employment directly with McChord, ultimately resulting in an employment agreement, the Employment Letter of April 1, 2009, signed by both McChord and Braband. [*Id.* at ¶¶85-86]. Braband contends that she discussed her concerns regarding her ownership interest in Datto directly with McChord, requesting that he arrange for the formal transfer of the ownership interest and that McChord personally assured her that he would address her concerns. [*Id.* at ¶¶103-05, 108-09]. Braband asserts that she received an email from McChord requesting her presence at a meeting on November 9, 2010. [*Id.* at ¶110]. Lastly, Braband asserts that at the meeting on November 9, 2010, she was informed by McChord that her employment was being terminated. [*Id.* at ¶112].

The Court finds, that these factual allegations regarding McChord's control over Braband's employment and compensation closely parallel the factual findings in *Butler* and are therefore sufficient to state a claim against McChord

individually for a violation of Conn. Gen. Stat. §31-71(e). Accordingly, Defendants' motion to dismiss Braband's first claim for relief against McChord is DENIED.

### H.  Fraud Claims against McChord and Datto

Braband brings claims of both fraud and fraudulent inducement against McChord and Datto.

#### 1.  Fraudulent Inducement

Braband's claim of fraudulent inducement asserts that McChord, acting on behalf of Datto, induced Braband to accept its offer of employment by representing that she would receive a 10% equity interest in Datto, provided that she remained employed by the Company for at least one year, and further induced her to accept the position by representing that she would receive an additional 10% interest in Datto if the Company reached certain performance goals. Braband asserts that McChord knew at the time that he made these representations that they were false, and that he made the representations with the intent to induce her to rely upon them, knowing that she would not forego an employment position with UBS to join Datto without the promise of an ownership interest in the Company. Braband contends that she relied on these representations, accepting the position at Datto and giving up the opportunity to continue working at UBS where she contends that she would have received a higher salary.

Defendants dispute the sufficiency of Braband's allegations of fraudulent inducement and fraud, relying on the heightened pleading standard for fraud

claims set forth in Fed. R. Civ. P. 9(b), and asserting that both causes of action fail to state a claim upon which relief may be granted.

Regarding fraudulent inducement, Defendants contend that Braband has not alleged any particularized facts about Datto to support a claim against Datto. Similarly, Defendants argue that Braband's claim of fraudulent inducement against McChord should be dismissed because she has not included any individualized allegations against McChord other than in his official capacity, asserting only that he made various representations "on behalf of Datto," without any allegation that he personally benefitted from the fraudulent representations.

Further, Defendants contend that Braband has failed to state a claim against either McChord or Datto because her factual allegations are insufficient to satisfy the elements of a fraud claim. Specifically, Defendants argue that Braband's allegations cannot establish that she relied upon the representations about an ownership interest in Datto because the representations were memorialized in the Employment Letter dated April 1, 2009, a month after Braband began her employment with Datto in March 2009. Further, Defendants contend that Braband has failed to allege that she relied to her detriment, because she has not claimed that she had an actual offer of employment at UBS nor any assurances that she could remain in the training program. Additionally, Defendants contend that Braband has failed to assert any facts to show that any of the asserted representations were false, or known to be false, indicating only that McChord knew them to be false "upon information and belief."

"Under Connecticut law, the essential elements of a cause of action sounding in fraud, including claims of misrepresentation and fraud in the inducement, are: ' (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.' " *465 Corp. v. United Natural Foods, Inc.*, No. 3:09cv1983 (JBA), 2011 WL 87292, at *3 (D.Conn. Jan. 11, 2011) (quoting *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 643 (2004)).

The Court finds Defendant's argument regarding reliance to be unpersuasive. Braband has alleged that McChord first contacted her to offer her a position at Datto in February 2009. The mere fact that the employment agreement was memorialized in April 2009 does not preclude the exchange of representations as part of the agreement negotiation and agreement process. Defendants' argument regarding a lack of injury is equally unpersuasive. Braband's allegations that she was employed "in an elite training program at the international investment bank, UBS," and was advised "by a UBS representative that she had been ranked in the top 5% of her training class (out of 100 trainees) and would be offered a permanent position in the firm's private wealth management division," fall well within the pleading standard articulated in *Iqbal*, 29 S.Ct. at 1949-50. [Dkt. #20, Braband's Counterclaims, ¶81].

However, Braband's allegations regarding Datto and McChord's knowledge of the falsity of the representations include little more than a bare recitation of the

41

second essential element of a claim for fraudulent inducement. Braband's

allegations include the following:

> To induce Ms. Braband to accept its offer of
> employment, McChord, on behalf of Datto, represented
> that Ms. Braband would receive a 10% equity interest in
> Datto, provided that she remained employed by the
> Company for at least one year. Additionally, as further
> inducement to Ms. Brabnad to accept the offer of
> employment, McChord, on behalf of Datto, represented
> that Ms. Braband would receive an additional 10% equity
> interest in Datto if the Company attained certain
> performance goals. Upon information and belief, at the
> time McChord made these representations, he knew
> them to be false. As apparent from his wrongful acts
> and omissions, McChord made these representations
> with the intent to induce Ms. Braband's reliance upon
> them. McChord knew that Braband would not forego her
> highly-compensation employment position with UBS,
> and accept his offer of employment with his fledgling
> start-up company, absent the opportunity to attain an
> ownership interest in Datto.

The assertion that, "upon information and belief" McChord knew the

representations to be false, is a mere "boilerplate characterization," a conclusory

allegation absent any particularized or circumstantial facts to support it. *See

Whitaker v. Taylor*, 99 Conn.App. 719, 731 (2007). The Connecticut Appellate

Court recently addressed similarly bare and conclusory allegations, and held

them to be insufficient, although liability was upheld in light of a declaratory

judgment. *See id.* (holding that plaintiff's allegations that representations "were

known by [defendants] to be false when made and were made with the purpose of

inducing the plaintiff to make the loan," were insufficient to state a claim of

fraud). Although the heightened pleading standard for fraud claims set forth in

Fed. R. Civ. P. 9(b) "relaxes the pleading requirement for intent, knowledge or

other condition of the mind, the Second Circuit 'require[s] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent.' " *Wilenta Feed, Inc. v. Arnold Food Co., Inc.*, 2006 WL 798916, at *3 (D.Conn. Mar. 29, 2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). The mere "fact that a party has breached a contract does not create a strong inference of fraud." *Wilenta Feed*, 2006 WL 798916, at *3 (citing *Campaniello Imps., Ltd. v. Saporiti Italia S.P.A.*, 117 F.3d 655, 664 (2d Cir. 1997)).

Accordingly, Defendant's motion to dismiss Braband's claim against McChord and Datto for fraudulent inducement is GRANTED.

### 2. Fraud

Where Datto claims Braband's performance deficiencies manifested themselves shortly after her employment commenced, Braband does not allege that these complaints were false and merely contrived to deprive her of the benefit of her bargain; instead, Braband's claim of fraud alleges that McChord knowingly made false representations to Braband between July 2010 and November 2010 regarding her ownership interest in Datto, intending to lull her into complacency so he could continue to receive the benefit of her employment services while he made arrangements to terminate her employment. Braband asserts that she relied upon these representations to her detriment.

Defendants argue that Braband's fraud claim should be dismissed, asserting that she has failed to allege any action taken in reliance on any representation or any injury resulting from the representation because she was an at-will employee with no promise of continued employment, and she has not

**43**

alleged that she had received any other offers of employment. Further, Defendants contend that the allegations of communications with McChord regarding the ownership interest in Datto fail to demonstrate any fraudulent intent on the part of either Datto or McChord.

As previously discussed, "[u]nder Connecticut law, the essential elements of a cause of action sounding in fraud, including claims of misrepresentation and fraud in the inducement, are: ' (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.' " *465 Corp.*, 2011 WL 87292, at *3 (quoting *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 643 (2004).

The Court is unpersuaded by Defendants' argument that Braband's allegations include no indication that she suffered an injury as the result of any representation. Braband has alleged that she began to question McChord about formalizing her ownership interest in July 2010, and Braband's allegations of McChord's conduct following the initial conversations in July and September 2010 plausibly allege that McChord had a dishonest purpose and sought to placate Braband into remaining employed with the Company until such time as he could orchestrate her termination and attempt to convince her to relinquish any claim to the desired ownership interest in Datto.

Braband alleges that on July 29, 2010 she spoke with McChord about her belief that she was entitled to a 20% ownership interest in the company, and she alleges that McChord assured her that she had a 20% ownership interest at that

time. She further alleges that McChord stated that within 30 days he would retain an attorney to formalize her ownership interest. Braband later alleges that when she followed up with McChord in September 2010 regarding his progress in formalizing her interest McChord "became irate and criticized Ms. Braband for raising the issue." [Dkt. #20, Braband's Counterclaims, ¶105]. In September 2010, Braband contends that McChord hired a new employee, Tira Vanderlinden, as Chief Financial Officer of Datto without informing Braband that he was seeking to hire anyone for the position. Later in September 2010, Braband admits that she signed an "Employee Handbook" which contained a Confidentiality and Non-Solicitation Agreement, prohibiting the disclosure of the Company's confidential information or trade secrets, and the use of the information for other than the Company's sole benefit, as well as an agreement not to solicit current or prospective customers of the Company for a one-year period following the termination of an employment relationship with the Company. In October 2010, Braband reports that she again contacted McChord to inquire about her ownership interest, alleging that McChord responded, as follows:

> This is something I need to do. The hard part is that there are many issues on my plate . . . I understand it is a priority for you  . . . at the same time I think it is in both yours and my best interest that my top priority be growing the value of Datto. Shares in Datto aren't meaningful unless datto is worth something. I will make every reasonable effort to get this completed in the next 30 days but it may take up to 60 days. Please have faith on this issue. [*Id.* at ¶109].

Lastly, Braband alleges that on November 8, 2010, while attending an industry event on behalf of the Company, she received an email from McChord requesting

that she attend a meeting at 9:00 AM the following day with Datto's lawyers. Braband contends that when she arrived at the meeting, McChord informed her that her employment relationship was being terminated.

Consistent with Fed. R. Civ. P. 9(b)'s relaxed pleading requirement for intent and knowledge, these allegations create a strong inference of fraudulent intent. *See Shields*, 25 F.3d at 1128 (recognizing that fraudulent intent may be inferred from facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness"). It is reasonably inferred from the allegations that McChord attempted to reassure Braband, from her first inquiry, that she in fact already had a 20% ownership interest, and the only remaining step was to acquire an attorney to memorialize the transfer through formal documentation. However, Braband has alleged that in fact no such transfer was ever made and she currently does not have a 20% ownership interest in Datto. This fact alone indicates that McChord knew his representations to be untrue at the time that he made them. However, the allegations indicate that McChord persisted in his attempt to convince Braband that the formalization process was underway, all the while inducing her to sign a confidentiality and non-solicitation agreement contained in an "employee handbook," forcing her to relinquish rights on the hope that McChord would remain true to his word. Then, once Braband was out of town on company business, McChord orchestrated her termination.

These allegations safely satisfy all four essential elements of a fraud claim, demonstrating a plausible if not strong inference that McChord repeatedly assured Braband that she had a 20% ownership interest in Datto which would

**46**

soon be memorialized, knowing such a statement to be false, seeking to placate

her into remaining employed with Datto and relinquishing further rights by

signing a confidentiality and non-solicitation agreement.

Lastly, the Court finds Defendants' assertion that Braband's claim of fraud

against McChord must be dismissed because no allegations have been asserted

against McChord in his individual capacity, as opposed to his capacity as an

officer of Datto, to be wholly unsupported by the applicable case law. As a recent

Connecticut Appellate Court decision emphasizes:

> It is well established that an officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, *whether or not he acts on behalf of his principal or corporation*, he is liable to third persons injured thereby . . . Thus a director or officer who commits the tort or who directs the tortious act done, or participates or operates therein, is liable to third persons injured thereby, even though liability may also attach to the corporation for the tort. *Cohen v. Roll-A-Cover, LLC*, 131 Conn.App. 443 (2011) (affirming the trial court's judgment holding both a corporate defendant and individual officer liable for fraudulent misrepresentations to the plaintiff).

In light of this well-established precedent, McChord's attempt to deny individual

liability is both disingenuous and specious where Braband has alleged that

McChord both orchestrated and perpetrated the fraud against her.

Accordingly, Defendants' motion to dismiss Braband's claims of fraud

against Datto and McChord are DENIED.

> I.   **Securities and Exchange Act 10b-5 and Securities Exchange Act 20(A)**

In addition to her common law fraud claims, Braband raises two securities fraud claims pursuant to the Securities and Exchange Commission Rule 10b-5, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  In particular, Braband's &10(b) and 10b-5 claim alleges that McChord violated 10b-5 by knowingly making "false, manipulative and deceptive representations to Ms. Braband concerning her right to acquire an ownership interest in Datto for the purpose of inducing her to accept Datto's offer of employment." [Dkt. #20, Counterclaims, ¶174]. Further, Ms. Braband claims while negotiating the terms of the employment agreement, McChord knowingly misrepresented the value of Datto stock she was to acquire pursuant to the employment agreement. Braband's claim under §20(a) alleges that McChord, as a "controlling person under §20(a), may be held derivatively liable for Datto's fraudulent acts.

Defendants argue that Braband's claims of securities fraud must be dismissed for failure to allege with specificity any material misstatement or fraudulent intent.

As the Second Circuit has articulated, in order to state a claim under Rule 10b-5, a plaintiff must allege that the defendants: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Bay Harbour Management LLC v. Carothers*, 282 Fed.Appx. 71, 74 (2d Cir. 2008) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 296 F.3d 161, 172 (2d. Cir. 2005), *cert denied*, 546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321(2005)).  A securities fraud claim based on misstatements

must also satisfy Fed. R. Civ. P. 9(b)'s requirement of detailed pleading of fraud claims, alleging with specificity "(1) the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Allegations that are conclusory or unsupported by factual assertions are insufficient." *Bay Harbour*, 282 Fed.Appx. at 74 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Additionally, the Second Citcuit has interepted the Private Securities Litigation Reform Act's "pleading standards pertaining to the defendant's intent to require the plaintiff to allege 'facts [either] (1) showing that the defendants had both motive and opporutunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.' " *Id.* (quoting *Shaar Fund*, 493 F.3d at 99).

At the outset, the Court notes that Defendants do not dispute Braband's allegation that the provisions of the Employment Letter relating to the transfer of Datto stock to Braband constitute a "purchase" or "sale" of securities under the securities statutes. Moreover, the Court notes that this question has been resolved by the Second Circuit's decision in *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555 (2d Cir. 1985) which held that an award of stock options pursuant to an employment agreement conditioned on the satisfaction of certain sales targets constituted a sale of securities even if the stock was not in fact sold. Therefore, the Court will limit its analysis to the two paragraphs of Braband's counterclaims setting forth the factual allegations to substantiate her claims of securities fraud.

The two paragraphs upon which Braband relies for her securities fraud claims are lacking in both substance and detail. Braband's allegation that "McChord knowingly made false, manipulative, and deceptive representations to Ms. Braband concerning her right to acquire an ownership interest in Datto for the purpose of inducing her to accept Datto's offer of employment," fails to allege specific statements claimed to be fraudulent, or where and when those statements were made. Although Braband seems to indicate that the fraudulent statements were made "during pre-hiring communications" and "in or around February 2009," Braband does not allege any specific statements claimed to be fraudulent.  Moreover, the single statement relating to an allegedly material misrepresentation states only that Datto "misrepresented the value of Datto stock to be acquired," without any facts to substantiate this contention. Brabad's bare allegations provide neither the allegedly fraudulent valuation offered by McChord nor any contention as to the accurate valuation of the shares. Conclusory allegations of a misrepresentation of the value of stock absent any documentation to indicate that the defendants knew and misrepresented the true value cannot satisfy the requisite scienter for a claim of securities fraud. *See Bay Harbour*, 282 Fed.Appx. at 75 (affirming the district court's dismissal of plaintiff's fraud claims based on the valuation where the plaintiffs failed to identify a single report indicating that any of the defendants knew and concealed the true value of the assets).

Finding that the conclusory allegations set forth in two paragraphs are woefully in adequate to state a claim of securities fraud pursuant to Rule 10b-5,

Braband's fourth claim against McChord and Ninth Counterclaim against Datto are DISMISSED. As Braband's fifth claim for relief against McChord pursuant to §20(a) of the Securities Exchange Act is predicated upon a finding that Datto committed acts of securities fraud, such claim must also be DISMISSED.

**J.   Breach of Fiduciary Duty against McChord and Vanderlinden**

Braband has raised claims against both McChord and Vanderlinden asserting that each breached a fiduciary duty owed to Braband as a minority a beneficial shareholder of Datto. In particular, Braband alleges that McChord, a majority shareholder, breached his fiduciary duty owed to Braband, a beneficial and minority shareholder, through his fraudulent representations and wrongful termination of Braband's employment. [Dkt. #20, Counterclaims, ¶185].  Further, Braband alleges that McChord breached his fiduciary duty to her by "diverting corporate monies to pay for extravagant vacations for himself and other personal expenses." [*Id.* at 186]. Braband alleges that Vanderlinden, as Datto's Chief Financial Officer, owed a fiduciary duty of care, loyalty and good faith to Braband, a minority and beneficial shareholder of Datto, which she contends that Vanderlinden breached through her "active and material involvement in the wrongful termination of Ms. Braband's employment and retention of her Datto stock." [*Id.* at ¶191].

Defendants urge the Court to dismiss each of these claims for breach of a fiduciary duty asserting that Braband has failed to allege any individual harm to

here interests as a shareholder where her allegations of wrongdoing relate to her wrongful termination.

To the extent that Braband's claims of breach of a fiduciary duty are based on her allegedly wrongful termination, these allegations fail to state a claim. Connecticut courts have routinely held that the cause of action for breach of the fiduciary duty owed by majority shareholders to a minority shareholder does not extend to claims based on the termination of the minority shareholder. *See Hackett v. Marquardt & Roche/Meditz & Hackett, Inc.*, No. X02cv990166881S, 2002 WL 31304216, at *3 (Conn. Super. Sept. 17, 2002)(noting that the Connecticut Supreme Court has recognized a general cause of action for breach of fiduciary duty of majority stockholders towards a minority stockholder, such cause of action has not been extended to case in which the majority's action was to terminate the employment of a minority shareholder).

As one Connecticut court explained, in the remedy of piercing the corporate veil to impose individual liability is restricted to extraordinary circumstances, "when there is sufficient basis for a claim of breach of fiduciary duty based on *fraudulent acts of individuals who occupy a fiduciary relationship,*" such as usurping a corporate opportunity, misappropriating corporate funds, failing to disclose information about the misappropriation of corporate funds, or looting the corporation to deprive the minority shareholder of the value of his assets. *Hart v. Mill Plain Autobody*, No. CV980353463S, 1999 WL 1212229 (Conn. Super. Dec. 3, 1999) (citations omitted). Therefore, in order to support a claim of breach of fiduciary duty against an individual officer or

majority shareholder, a plaintiff must allege fraudulent conduct to satisfy the essential elements of common law fraud, including, as previously discussed, (1) a false representation made as a statement of fact; (2) that was untrue and known to be untrue by the party making it; (3) made to the induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. *See id.* at \*3 (striking plaintiff's claim for breach of fiduciary duty where plaintiff's claim was predicated upon his removal from the board and did not include any allegations that his removal was predication upon a knowingly false representation intended to induce reliance).

Braband has alleged only that McChord's "fraudulent representations and wrongful termination of Ms. Braband's employment" McChord breached a fiduciary duty to her, and similarly that Vanderlinden "aided and abetted McChord in violating his fiduciary duty to Ms. Braband through her active and material involvement in the wrongful termination of Ms. Braband's employment and retention of her Datto stock." [Dkt. #20, Counterclaims, ¶¶185, 191]. Such claims for breach of fiduciary duty are predicated upon her allegedly wrongful termination from Datto and therefore fail to state a claim of breach of fiduciary duty against either McChord or Vanderlinden. Moreover, as previously discussed during the Court's analysis of Ms. Braband's securities fraud claims, her conclusory reference to "fraudulent representations," cannot sustain her burden of alleging particularized facts regarding a claim of fraud as required under Fed. R. Civ. P. 9(b) and Connecticut case law regarding a claim for breach of fiduciary duty against an individual corporate officer or majority shareholder. *See Hart,*

1999 WL 1212229, at *3 (holding plaintiff's allegations as to breach of fiduciary duty to be "legally insufficient" where plaintiff failed to allege that his removal was predicated upon a false representation made as a statement of fact made knowingly and with the intention of inducing the plaintiff to rely).

Braband's further allegation that McChord breached his fiduciary duty by "diverting corporate monies to pay for extravagant vacations for himself and other personal expenses," is not properly the subject of an individual claim for breach of fiduciary duty, but rather, must be alleged derivatively. As the Connecticut Supreme Court has noted:

> A distinction must be made between the right of a shareholder to bring suit in an individual capacity as the sole party injured, and his right to sue derivatively on behalf of the corporation alleged to be injured. ... Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury is generally not to the shareholder individually, but to the corporation-to the shareholders collectively. ... In this regard, it is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding "secondarily," deriving his rights from the corporation which is alleged to have been wronged. It is, however, well-settled that if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual. In such case, the plaintiff-shareholder sustains a loss separate and distinct from that of the corporation, or from that of other shareholders, and thus has the right to seek redress in a personal capacity for a wrong done to him individually." *Yanow v. Teal Indust., Inc.*, 178 Conn. 262, 281-82 (1979) (citations omitted).

54

Braband's allegation that MChord diverted corporate funds to pay for extravagant vacations and other personal expenses is plainly an injury to the corporation as a whole and not an injury the harmful effects of which would be borne by Braband alone, individually. Appropriate funds of the corporation for personal use deprives the corporation of funds which could be applied to and used in the best interests of the company. Accordingly, this allegation may only be maintained derivatively. *See Salit v. Stanley Works*, 802 F.Supp. 728, 737 (D.Conn. 1992)(dismissing plaintiff's claim for breach of fiduciary duty where the injury alleged pertained "to the corporation, and therefore, to the shareholders collectively rather than individually").

Therefore Braband's claims for breach of fiduciary duty levied against McChord and Vanderlinden are hereby DISMISSED.

### K.  Tortious Interference with Employment Relationship

Braband alleges that McChord and Vanderlinden, acting in concert, tortiously interfered with her employment relationship with Datto. Defendants argue that such allegations fail to state a claim upon which relief may be granted asserting that an agent may not be held liable for interfering with a contract of his principal unless the agent is acting as an outsider.

As the Connecticut Appellate Court has articulated:

> [I]t is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two *other* parties. An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable

would be, in effect, to hold the corporation liable in tort
for breaching its own contract. *Wellington Systems, Inc,
v. Redding Group, Inc.*, 49 Conn. App. 152 (1998)
(internal quotation marks and citations omitted).

Connecticut courts have recognized a limited exception to this rule in circumstances where it is alleged that the agent's interference with the contract of his principal was undertaken outside the scope of his duty or for personal gain *Id.* at 168 (citing *Bowman v. Grolsche Bierbrouwerij B.V.*, 474 F.Supp. 725, 733 (D.Conn. 1979). However, as the Connecticut Superior Court reasoned in *Hackett*, this exception must be defined narrowly in order to avoid allowing the exception to swallow the general rule such that "the rule barring tortious interference cases between employees will cease to function whenever the plaintiff meets the basic prerequisite of alleging tortious interference." *Hackett*, 2002 WL 31304216, at *4. As such, the *Hackett* Court held that a plaintiff could not rely on the personal gain exception on the basis of allegations that a defendant corporate officer tortiously interfered with plaintiff's employment relationship in order to gain job security and other financial benefits from plaintiff's termination along with an opportunity for the defendant's girlfriend to advance within the corporation. *Id.* Rather, the *Hackett* Court held that "only if the agent is not acting within his corporate powers, and in effect becomes an outsider, would it be fair to conclude that he is capable of interference with the corporation's contracts. *Id.* Therefore, the *Hackett* Court held that even if the defendant-agent acted in bad faith or with improper motives, he had authority to fire the plaintiff without cause and therefore his termination of the plaintiff was within the scope of his corporate authority, thereby precluding plaintiff from pursuing a claim of tortious

interference with employment relationship against him. This Court finds the reasoning of the Connecticut Superior Court in *Hackett* to be highly persuasive.

Given that Braband's Employment Letter did not contain a provision restricting Datto's right to terminate her employment absent good cause and absent any allegations to suggest that either McChord or Vanderlinden acted sufficiently outside their corporate capacity so as to behave as "outsiders" in terminating her employment, the Court holds that Braband's claims for tortious interference with employment relationship may not lie where they are predicated upon agents interfering with contracts of their principal. Accordingly, Braband's claims for tortious interference with her employment relationship are DISMISSED.

### L.  Conversion

Lastly, Braband asserts a claim of common law conversion against Defendant McChord alleging that McChord intentionally and without authorization retained and interfered with her property, the Datto shares she is owed under the Employment Letter in order to enhance his own personal financial interests. Further, Braband alleges that she believes McChord has negotiated with a third party or parties to raise capital through the sale of shares in the Company Defendants argue that this claim for conversion should be dismissed because her claim arises under an express contract.

Under Connecticut law, a cause of action in tort for conversion exists regarding "an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights . . . It is some unauthorized act which deprives another of his property permanently or for

an indefinite time, some unauthorized assumption and exercise of powers of the owner to his harm." *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 649 (2002).

However, the Connecticut Supreme Court has held that "[w]hen an action arises from a claim under an express or implied contract, a claim in tort is inappropriate." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 421 (2007) (citation omitted). Therefore where an express contractual right to compensation exists, claims of conversion for failure to provide that compensation cannot lie. *See Garner*, 2010 WL 3447880, at *5 (holding that where "plaintiff's Complaint expressly alleges that he is entitled to stock options in the common stock of [defendant corporation] pursuant to his Agreement with the defendants . . . his claims of conversion and statutory theft fail as a matter of law and must be stricken.").

Additionally, as the Connecticut Superior Court reasoned in *Garner*, even if a claim of conversion were cognizable despite the express contract, a fixed percentage of shares is not a sufficiently "definite identity" as required to sustain a claim of conversion. *See id.* Although the percentage of shares to be provided is fixed, where plaintiff cannot identify the shares "by number, date of issuance or otherwise," the shares are not "a specific, identifiable chattel, that another person's interference with that right of possession would constitute conversion." *Id.*

Therefore where Braband's claim of conversion is predicated upon an express contractual provision, such claim must be DISMISSED.

58

**V.      Conclusion**

Based upon the above reasoning, the Court holds that the employment agreement set forth in a letter dated April 1, 2009 is an enforceable agreement. Further, the Court holds that Braband's motion for judgment on the pleadings is GRANTED in part and DENIED in part. Her motion for judgment on the pleadings on Count One and Count Six of her counterclaims as to the initial 10% ownership interest in Datto is GRANTED, whereas her motion for judgment on the pleadings on Count One and Count Six of her counterclaims as to the second 10% ownership interest in Datto is DENIED.  The Court holds that Defendants' motion to dismiss is GRANTED in part and DENIED in part. The motion to dismiss is GRANTED as to Braband's fourth counterclaim for promissory estoppel, fifth counterclaim for an accounting, Braband's seventh counterclaim and second claim against McChord for fraudulent inducement, Braband's ninth counterclaim and fourth claim against McChord pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, Braband's tenth counterclaim and fifth claim against McChord pursuant to Section 20(a) of the Securities and Exchange Act of 1934, Braband's sixth claim against McChord for breach of fiduciary duty, Braband's claim against Vanderlinden for breach of fiduciary duty and/or aiding and abetting a breach of fiduciary duty,  eighth claim against McChord and Vanderlinden for tortious interference with employment relationship, ninth claim against McChord and Vanderlinden for conversion, and tenth claim against McChord for unjust enrichment. Defendants' motion to dismiss is DENIED as to Braband's second

counterclaim for wrongful termination, Braband's third counterclaim for breach of the covenant of good faith, Braband's first claim against McChord for violation of Connecticut's wage protection statutes, and Braband's eight counterclaim and third claim against McChord for Fraud. Braband is hereby granted leave to amend her complaint to include a claim for inspection of corporate records pursuant to Conn. Gen. Stat. §33-946.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 29, 2012